records only a sampling of the accounts, as well as the records in those accounts, was used for detailed analysis.  Records were primarily randomly sampled but all large dollar checks relative to the accounts were obtained in an attempt to find checks for the purchase of lottery tickets.  None were located.

**Lottery Accounts**

21.  The accounts in this section were identified as having the characteristics of a Lottery Account as described in paragraph 11c.  Deposits to these accounts consisted of victims' funds in the form of checks, credit cards and money orders.  The checks were generally payable to the account name but some were written to other lottery accounts.  After victims' money was deposited, it was then transferred to other conspirator-controlled accounts via check and wire transfers.  Although the lottery accounts were opened at different banks, primarily in Santa Barbara and Santa Monica, California (all in the United States), many had identical names.  The following are the analyses of specific accounts, grouped by account name:

WORLD EXPERT

a.  Account number XXXX0792 was opened at Encino Bank in the name of WORLD EXPERT FUND by H WALTHER and S WALTHER on January 21, 1999, and closed on February 21, 2002. The mailing address for the account is **LOCATION 2**.

i.  I reviewed deposited items for WORLD EXPERT

28

and saw that between 2001 and February 2002, nearly $1,728,643 in deposits were made.  The deposits consisted of small dollar checks from individuals all over the United States.  Although most of the checks were made payable to "WORLD EXPERT," others were made to "RL Doorne," "Euro American," "Lottery Expert," and other names.  Notations on the checks indicated they were for the purchase of foreign and domestic lottery tickets.

ii.  I reviewed debits for this account between 2001 and February 2002 and saw that $761,975 in transfers were made to Payment Accounts in the name of NORTH AMERICAN PAYMENT at Union Bank (account number XXXXXX2499), and US Bank (account number XXXXXXXX1853).  An additional $627,383 of victims' funds was deposited to the Bleed Account in the name of HENRY WALTHER WIRE ACCOUNT (US Bank account number XXXXXXX1928).  Other significant debits included $31,963 written to credit card companies, and $118,576 in what appear to be scheme expenses to companies like Astro Computer, List Counselors Inc., and Mail Distribution Center.  All of these debits represent nearly 89% of the deposits made.  There was no indication lottery tickets were ever purchased.

b.  Account number XXXXXXXX1049 was opened at US Bank by J DES ROSIERS in the name of WORLD EXPERT FUND on August 11, 2000, and closed on August 15, 2002.  The records listed **LOCATION 2** as the business address for WORLD EXPERT.

29

i.    I reviewed a sample of the deposited items for this account and saw that between 2001 and 2002 nearly $1,387,058 in deposits were made into this account.  The deposits consisted of tens of thousands of checks from people all over the United States. The majority of the checks were made payable to WORLD EXPERT but some were to "Processing Center, The Netherlands," "RL DOORNE," or "IWB," and other names.  In the memo section of some of the checks were notes indicating they were for the purchase of foreign lottery tickets.

ii.    I reviewed a sample of debits from WORLD EXPERT and saw that between 2001 and 2002 nearly $1,180,950 was transferred to NORTH AMERICAN PAYMENT at US Bank (account number XXXXXXXX1853).  Other notable debits were $91,800 in checks were written to "Cash" or "J DESROSIERS" and $5,046 to Safechecks. This represents 92% of all the deposits. There was no evidence that lottery tickets were ever purchased.

c.    Account number XXXXXX4509 was opened at WELLS FARGO by H WALTHER and S WALTHER in the name of WORLD EXPERT on December 14, 2001, and closed September 27, 2002.  The records list the business address for WORLD EXPERT as 100 Oceano Ave, #3 Santa Barbara, CA.  I know this to be the former residential address for S WALTHER.

i.    I reviewed the deposited items for WORLD EXPERT FUND and saw that between December 4, 2001, and September

30

27, 2002, nearly $1,112,716 in deposits were made into this account. The deposits consisted of thousands in small dollar checks from people all over the United States. The memo section of many of the checks had notes indicating they were intended for the purchase of foreign lottery tickets. Although most of the checks were made payable to "WORLD EXPERT" there were many checks payable to "THE SHAMROCK AGENCY," "OLD AMSTERDAM," "EURO AMERICAN," and "GLOBAL SEARCH," among other names.

ii. I saw that included in deposits dated January 22, 2002, March 21, 2002, and April 3, 2002, were checks from victim Paul Woods made payable to WORLD EXPERT.

iii. I reviewed canceled checks from WORLD EXPERT and saw that in 2002, $538,000 (of the $1,112,716) in victims' funds was transferred via check to the conspirators' Payment Accounts in the name of NORTH AMERICAN PAYMENT at Wells Fargo Bank (account number XXXXXX1687), Union Bank (account number XXXXXX2499), and US Bank (account number XXXXXXXX1853). An additional $161,703 of victims' money was deposited to the Bleed Account in the name of HENRY WALTHER ATTORNEY WIRE ACCOUNT at US Bank (account number XXXXXXX1928). The transfer and payments to these entities represent 62% of all the deposits made. There was no indication that lottery tickets were ever purchased.

d. During the course of this investigation, I reviewed records for Citibank account number XXXXXX4990. The

31

account was opened by S WALTHER in the name of WORLD EXPERT on October 31, 2002 (two months after the other WORLD EXPERT accounts were closed), and is still open. The mailing address associated with this account is **LOCATION 1**. I reviewed the bank records and learned the following:

     i.    I reviewed deposited items for this account and saw nearly $2,227,681 in deposits between 2002 and October 2005.  These deposits consisted of small dollar checks from individuals all over the country.  Although most of the checks were made payable to the "SHAMROCK AGENCY" there were many checks deposited payable to "International Irish Sweepstakes," "European Government Lottery," "EURO AMERICAN," and "WORLD EXPERT," among other names.  Notations on the checks indicated they were for the purchase of tickets in foreign lotteries.

     ii.    I reviewed canceled checks from WORLD EXPERT and saw that between 2002 and October 2005, at least $104,500 in victims' funds were transferred via check from WORLD EXPERT FUND to EURO AMERICAN PAYMENT at Union Bank (account number XXXXXX9804).  An additional $1,471,857 in checks representing victims' money was deposited to Bleed Accounts; $721,602 to HENRY WALTHER ATTORNEY WIRE ACCOUNT at US Bank (account number XXXXXXX1928), and $750,255 to WESTERN INTERNET at Woods and Houston (account number XXX051).  The canceled checks to all of these entities represent 66% of the deposits made in those years.

32

There was no indication that lottery tickets were ever purchased.

SHAMROCK AGENCY

e.   Account number XXXXXX1695 was opened at Wells Fargo by S WALTHER in the name of SHAMROCK AGENCY on November 16, 2000, and was closed on August 27, 2002.  The records listed a business address for SHAMROCK AGENCY as 509 Brinkerhoff Ave, Santa Barbara, California.  I know this to be the address for S WALTHER's employer (as explained in paragraph 54).

i.   I reviewed the deposited items for this account and saw that between January 2001 and August 27, 2002, nearly $675,000 in deposits were made into this account.  The deposits consisted of thousands of small dollar checks from people all over the United States.  In the memo section of many of the checks were notes indicating they were for the purchase of foreign and domestic lottery tickets.  Although most of the checks were made payable to the "SHAMROCK AGENCY" there were many checks deposited payable to "International Irish Sweepstakes," "European Government Lottery," "EURO AMERICAN," and "WORLD EXPERT," and other names.

ii.   I saw that as part of a deposit made on June 1, 2001, were two checks from victim Paul Greven payable to EURO AMERICAN.

iii.  I reviewed canceled checks from SHAMROCK AGENCY and saw that between January 1, 2001, and August 27, 2002

33

(when the account was closed), at least $262,239 in victims'
funds were transferred via check to the conspirators' Payment
Accounts in the name of NORTH AMERICAN PAYMENT at Union Bank
(account number XXXXXX2499) and US Bank (account number
XXXXXXXX1853).   An additional $136,767 of victims' money was
deposited to the Bleed Account in the name of HENRY WALTHER
ATTORNEY WIRE ACCOUNT at US Bank (account number XXXXXXX1928).
The canceled checks to these entities represent 59%, of all
deposits made in those years.   There was no indication that
lottery tickets were ever purchased.

   f.   US Bank Account number XXXXXXXX5188 was opened by
H WALTHER in the name of SHAMROCK AGENCY before 2000 and is still
open.   The records listed the current mailing address for
SHAMROCK AGENCY as **LOCATION 2**.

    i.   I reviewed the deposited items and saw that
between 2001 and November 2005, nearly $1,657,900 in deposits
were made into this account.   The deposits consisted almost
exclusively of small dollar checks from individuals throughout
the United States.   Notations on many of the checks indicated
they were intended for the purchase of tickets in foreign and
domestic lotteries.

    ii.   I reviewed debits from SHAMROCK AGENCY and
saw that between 2001 and 2004, at least $250,790 was transferred
to the Payment Accounts in the name of NORTH AMERICAN PAYMENT

(Union Bank account number XXXXXX2499), and EURO AMERICAN (Union Bank account number XXXXXX9804).  In addition, between 2003 and 2005, another $860,812 of victims' monies was transferred to the Bleed Accounts in the names of HENRY WALTHER ATTORNEY WIRE ACCOUNT (US Bank account number XXXXXXX1928), and WESTERN INTERNET (Woods and Houston account number XXX051).  Other notable checks included a $5,731 check to American Express and a $20,000 check to Walther Wilshire Building. All of these debits represent nearly 68% of all deposits.  I saw no checks written for the purpose of purchasing lottery tickets.

       iii. From May 23, 2005, to July 8, 2005, there were seven canceled checks written to Wits End Delivery Service signed by H WALTHER.  The checks are endorsed by Leslie Wilbanks. The endorsement on one of the checks is canceled through a bank in Missouri.  Leslie Wilbanks is the same name mentioned in paragraph 29 as a delivery person for PJ SWINK.

MISCELLANEOUS ACCOUNTS

       g.   Account XXXXXX1661 was opened at Wells Fargo Bank by S WALTHER in the name of GERMAN SWISS on November 16, 2000, and is still open.  The records list a business address for GERMAN SWISS of 509 Brinkerhoff Ave, Santa Barbara, California. I know this to be the address for S WALTHER's employer (see paragraph 54).

       i.   I reviewed the deposited items for this

35

account and saw that in 2001, nearly $14,396 in deposits were made into this account. The deposits consisted of thousands of small dollar checks from people all over the United States. In the memo section of many of the checks were notes indicating they were for the purchase of foreign and domestic lottery tickets.

ii. I reviewed canceled checks from GERMAN SWISS and saw that at least 93% of the deposited funds were transferred via check to the conspirators' Payment Accounts in the name of NORTH AMERICAN PAYMENT at Union Bank (account number XXXXXX2499) and US Bank (account number XXXXXXXX1853).

h. Account XXXXXX1679 was opened at Wells Fargo Bank by S WALTHER in the name of EUROPEAN UNION COMMISSION on November 16, 2000, and closed August 30, 2002. The records listed a business address for EUC of 509 Brinkerhoff Ave, Santa Barbara, California. I know this to be the address for S WALTHER's employer (see paragraph 54).

i. I reviewed the deposited items for this account and saw that between 2001 and August 30, 2002, nearly $32,574 in deposits were made into this account. The deposits consisted of thousands of small dollar checks from people all over the United States. In the memo section of many of the checks were notes indicating they were for the purchase of foreign and domestic lottery tickets.

ii. I reviewed canceled checks from EUROPEAN

36

UNION and saw that between January 1, 2001, and August 30, 2002
(when the account was closed), at least $17,525 in victims' funds
were transferred via check to the conspirators' Payment Accounts
in the name of NORTH AMERICAN PAYMENT at Union Bank (XXXXXX2499)
and US Bank (XXXXXXXX1853).  The canceled checks to these
entities represent 54% of all deposits made in those years.
There was no indication that lottery tickets were ever purchased.

      i.  Account number XXXXX8787 was opened at Encino Bank
in the name of MUTUAL MEDICAL INSURANCE TRUST by S WALTHER on
November 8, 2000, and closed on December 30, 2004.  The mailing
address for the account was 509 Brinkerhoff Ave, Santa Barbara,
California.  I know this is the address of S WALTHER's employer
(see paragraph 54);

      i.  I reviewed deposited items for MUTUAL MEDICAL
and saw that between 2001 and 2004, nearly $230,800 in deposits
were made.  The deposits consisted of checks from individuals all
over the United States.  Although most of the checks were made
payable to "MUTUAL MEDICAL," others were made to "Life
Insurance," and "Medical Insurance," among other names.  Many of
these checks have notations like "Triple Pension" or "For Triple
Insurance Member" in the memo section.   These checks are for
larger amounts than the deposits into the other Lottery Accounts.

      ii.  I reviewed debits for this account between
2001 and 2004, and saw that $112,535 in transfers were made to

the Payment Accounts in the name of NORTH AMERICAN PAYMENT at
Union Bank (account number XXXXXX2499) and US Bank
(XXXXXXXX1853).  An additional $77,737 of victims' funds was
deposited to the Bleed Accounts in the name of HENRY WALTHER
ATTORNEY WIRE ACCOUNT (US Bank account number XXXXXXX1928) and
WESTERN INTERNET (Woods and Houston account number XXX051).  All
of these debits represent nearly 82% of the deposits made.  There
was no indication that lottery tickets were ever purchased.

       j.   Account number XXXXX8795 was opened at Encino Bank
in the name of OLD AMSTERDAM TRUST by S WALTHER on November 8,
2000, and closed on December 30, 2004.  The mailing address for
the account was 509 Brinkerhoff Ave, Santa Barbara, California.
I know this is the address of S WALTHER's employer (see paragraph
54);

       i.   I reviewed deposited items for OLD AMSTERDAM
and saw that between 2001 and 2004, nearly $406,254 in deposits
were made.  The deposits consisted of checks from individuals all
over the United States.  Although most of the checks were made
payable to "OLD AMSTERDAM," others were made to "International
Pension Fund," "Mutual Pension Fund," "Gold Reserve Pension Fund"
and "Amsterdam Gold Reserve," among other names.  These checks
are for larger amounts than the deposits into the other Lottery
Accounts.

       ii.   I reviewed debits for this account between

2001 and 2004 and saw that $149,910 in transfers were made to the
Payment Accounts in the name of NORTH AMERICAN PAYMENT and EURO
AMERICAN PAYMENT at Union Bank and US Bank.  An additional
$167,861 was deposited to the Bleed Accounts in the name of HENRY
WALTHER WIRE ACCOUNT (US Bank account number XXXXXXX1928), and
WESTERN INTERNET (Woods and Houston account number XXX051).  All
of these debits represent nearly 78% of the deposits made.  There
was no indication that lottery tickets were ever purchased.

     k.   Account number XXX6927 was opened at Georgia State
Bank in the name of EURO AMERICAN FAX CO on July 23, 2003, by
WILLIAM CLOUD and MARY MCRAE.  The account is still open.  The
mailing address for the statements is **LOCATION 3**.

     i.   I reviewed the deposits for this account and
saw that between July 23, 2003, and October 2005, $1,151,645.76
was deposited into this account.  The deposits consisted almost
exclusively of transfers from credit card processing accounts.
(Such accounts would allow victims to pay the Lottery Companies
through their credit cards).  The deposits were made on a regular
basis.

     ii.   I reviewed debits from EURO AMERICAN and saw
that between July 2003 and November 2005, at least $158,500 was
transferred via check to the conspirators' Payment Account in the
name of EURO AMERICAN PAYMENT at Union Bank (account number
XXXXXX9804).  An additional $223,000 of victims' money was

deposited to the Bleed Account in the name of HENRY WALTHER ATTORNEY WIRE ACCOUNT at US Bank (account number XXXXXXX1928). Other significant debits included $199,700 in checks written to MARY MCRAE, $63,667 to Gary York and $50,000 to Charles Black Escrow.   As mentioned in paragraph 40, Charles Black is listed as the registered agent for EURO AMERICAN.   $374,500 was spent on apparent scheme expenses, such as payments to Astro Computer, Picasso Printing, Mail Distribution Center and Safechecks.   I located all of these businesses and determined that they are located in the Southern California area.   Furthermore, I saw on the website of Mail Distribution Center that the company provides mass mailing services such as envelope stuffing.   The canceled checks to these entities represent 93% of all the deposits made between July 2003 and October 2005.   There was no evidence that any lottery tickets were ever purchased.

**Payment Accounts**

22.   The accounts in this section were identified as having the characteristics of a Payment Account as described in paragraph 11d.   The analysis of these accounts revealed the victims' funds being deposited (from Lottery Accounts) and then transferred to other conspirator controlled accounts (Bleed Accounts), and used to make small payments falsely described as winnings to victims. There was no evidence of lottery tickets being purchased.   Although the Payment Accounts were opened at

40

different banks, many had identical names.  The specific analyses of the accounts are as follows:

NORTH AMERICAN PAYMENT

   a. Account XXXXXXXX1853 at US Bank was opened by J DES ROSIERS in the name of NORTH AMERICAN PAYMENT on October 2, 1998, and was closed on August 15, 2002.  The records listed **LOCATION 2** as the business address for NORTH AMERICAN PAYMENT.

   i. I reviewed a sample of the deposited items, and saw that between 2001 and August 15, 2002, nearly $3,118,686 in deposits were made into this account.  At least 94% of the deposits were transfers from the conspirators' "Lottery Accounts" including WORLD EXPERT, GERMAN SWISS, SHAMROCK AGENCY, OLD AMSTERDAM and MUTUAL MEDICAL.

   ii. I reviewed canceled checks from NORTH AMERICAN PAYMENT and saw that between 2001 and August 15, 2002, nearly $1,792,582 in checks were written to the "Bleed Accounts" in the name of WESTERN INTERNET (Woods And Houston account number XXX051), BUTTERFIELD, and CARNEGIE (previous name of WESTERN INTERNET account).  Those checks represent 57% of the all the deposits in the account for those years. I also saw that tens of thousands of small dollar checks were written to people all over the United States.  There was no evidence that lottery tickets were ever purchased.

   b. Account number XXXXXX1687 was opened at Wells

41

Fargo Bank by S WALTHER in the name of NORTH AMERICAN PAYMENT on November 16, 2000, and was closed on August 27, 2002. The records listed a business address for NORTH AMERICAN PAYMENT of 509 Brinkerhoff Ave, Santa Barbara, California. I know this to be the address for S WALTHER's employer (see paragraph 54).

       i. I reviewed the deposited items and saw that between 2001 and August 27, 2002, nearly $132,588 in deposits were made. Of those deposits, 99% were made in 2002 and mostly consisted of transfers from the conspirators' Lottery Accounts.

       ii. I reviewed canceled checks from the account and saw that between January 1, 2001, and August 27, 2002, small dollar checks were made payable to individuals with addresses all over the United States. On the face of the checks was the phrase, "On Behalf of World Expert Fund, Berlin Germany." In addition to those checks I saw nearly $25,000 in checks payable to one of the Bleed Account in the name of WESTERN INTERNET (Woods and Houston account number XXX051). These checks were all written approximately one week before the account closed.

       c. Account number XXXXXX2499 was opened at Union Bank by H WALTHER in the name of NORTH AMERICAN PAYMENT on December 18, 1999, and is still open. The records list **LOCATION 2** as the business address for NORTH AMERICAN PAYMENT.

       i. I reviewed the deposited items for this account and saw that between 2001 and May 2005, nearly $456,844

in deposits were made into this account.  There were no significant deposits after May 2005.  The deposits consisted almost exclusively of transfers from the Lottery Accounts including WORLD EXPERT, GERMAN SWISS, SHAMROCK AGENCY, OLD AMSTERDAM and MUTUAL MEDICAL INSURANCE.

ii.  I reviewed canceled checks from the account and saw that in 2001, a check for $3,400 was written to WESTERN INTERNET and in 2004, a check for $500 was written to HENRY WALTHER ATTORNY WIRE ACCOUNT.  I also saw that thousands of small dollar checks were written monthly to people all over the United States.  In addition to the small dollar checks, there were some individuals who received a few thousand dollars.  The checks written to the individuals had two unique features.  In the center of the check was a large seal with a symbol similar to that on the US dollar with the words "BACKED BY GOLD RESERVES" on the top of the seal.  Additionally, typed in the right-hand corner of these checks is the phrase "On behalf of: Old Amsterdam Pension and Trust."   H WALTHER's signature appears in the corner. There was, however, no evidence that lottery tickets were ever purchased.

d.  Account XXXXXX9804 was opened at Union Bank by S WALTHER in the name of EU AMERICAN PAYMENT on October 30, 2002, and is still open.  The records listed the current mailing address for EU AMERICAN PAYMENT as LOCATION 2.

43

i.    I reviewed the deposited items for this account and saw that from October 30, 2002, through October 2005, nearly $371,913 in deposits were made.  The deposits consisted almost exclusively of checks from the Lottery Accounts, including WORLD EXPERT at Citibank, SHAMROCK AGENCY at US Bank, EURO AMERICAN at Georgia State Bank, and OLD AMSTERDAM at Encino Bank.  However, one wire transfer of $23,622.43 was made from the Henry Walther Attorney Client Trust Account in 2002.

ii.    I reviewed debits from EU AMERICAN PAYMENT and saw that in 2004, at least $20,054.99 in checks were written to WESTERN INTERNET. The endorsement on the checks to WESTERN INTERNET showed Blacksmith Printing d/b/a WESTERN INTERNET.  The majority of the debits, however, were canceled checks, at least ten thousand, all under $10.00.  A sampling of these checks indicates these were payments made to victims all over the United States.  I saw that some of the names on the checks were the same names of people who wrote checks to World Expert Fund and Shamrock Agency.  Preprinted on the right hand corner of the checks is "On behalf of INTL IRISH ESCROW GROUP."  I saw no indication that lottery tickets were ever purchased.

**Bleed Accounts**

23.  The accounts in this section were identified as having the characteristics of a Bleed Account as described in paragraph 11e.  The analysis of these accounts revealed the victims' funds

44

being deposited and then transferred to other conspirator-controlled accounts, but no evidence of lottery tickets being purchased.   The Bleed Accounts were opened at different banks but many had the same names.   The specific analyses of the accounts are as follows:

a.   Account number XXXXXXX1928 was opened at US Bank by H WALTHER in the name of H WALTHER ATTORNEY WIRE ACCOUNT before 2001 and is still open.   The records list **LOCATION 2** as the business address for H WALTHER ATTORNEY WIRE ACCOUNT.

i.   I reviewed the deposited items for this account and saw that from 2001 through 2005, nearly $8,665,530 in deposits were made into this account.   Almost all of the deposits consisted of check transfers from accounts controlled by one of the conspirators and having names consistent with the scheme, including: Global Search Network, USA Payment, Worldwide Verification Services, and WWW Webpay.   In addition to deposits from those accounts were transfers from the accounts detailed in this affidavit, including WORLD EXPERT, GERMAN SWISS, SHAMROCK AGENCY, OLD AMSTERDAM and MUTUAL MEDICAL INSURANCE, NORTH AMERICAN PAYMENT and EURO AMERICAN.   Deposits from the accounts detailed in this affidavit represented more than 40% of all deposits.   Out of all the deposits I reviewed, there were minimal deposits that even appeared to be for legitimate legal work.

ii.   I reviewed wire transfers from the account,

45

and saw that between September 10, 2003, and October 21, 2004, nearly $124,000 was wired to Bank of America for WILLIAM CLOUD. Michael Bolger (mentioned in paragraph 35) received five wires from January 22, 2004, to January 25, 2005.  Other wires went to World Wide Expert, International Mail Forwarding Network, Mikhail Larguine, Paula Hays Kelly, James J Elliot, Gary York (one of the payees from the EURO AMERICAN account listed in paragraph 27), and one to Bleed Account, ARTHUR BUTTERFIELD. Wires that were established to be automatically and regularly sent included: GERMAN SWISS, Mikhail Larquine and wires to accounts in Costa Rica.  None of the companies have any apparent ties to lotteries.  Again there was no evidence of lottery tickets being purchased.

      b.   Account number XXX051 was opened at Woods and Houston on March 21, 2001, in the name of WESTERN INTERNET by PJ and MICHAEL SWINK and is still open.  The mailing address for the statements and the business is LOCATION 4.  PJ and MICHAEL SWINK both have full authority on this account.  The records show that this account was formerly known as CARNEGIE.

      i.   I reviewed deposited items for this account and saw that the deposits came almost exclusively from the Lottery and Payment Accounts.

      ii.   I reviewed canceled checks from this account and saw thousands of dollars written to the US Postal Service,

computer service companies, and for vehicle expenses.

c.   Account number XXX959 was opened on January 8, 1990, in the name of PJ SWINK d.b.a. ARTHUR T BUTTERFIELD & ASSOCIATES.  MICHAEL SWINK is listed as signor on the account. The bank records indicate that PJ SWINK changed her name from PJ SUMMERS.  The mailing address for the statements and the business is **LOCATION 4**.

i.   I reviewed a sample of deposited items for this account and saw deposits from the conspirators' Payment and Lottery Accounts.

ii.   I have not yet analysed the withdrawals from this account.

Witness Statements

24.   On December 19, 2005, and January 9, 2006, I spoke with William Wagner, who had been a new accounts representative at Citibank in Santa Barbara.  When he had been so employed, he assisted an individual in opening account number XXXXXX4990 in the name of WORLD EXPERT.  Wagner identified S WALTHER's California Department of Motor Vehicles photograph in a photographic lineup as the person who opened the WORLD EXPERT account.  S WALTHER told Wagner that the account was to be used for a consulting business S WALTHER was starting.

25.   On December 21, 2005, I spoke with Brendan Mullally, who told me that he is a Customs and Border Protection Officer

47

with the Department of Homeland Security assigned to the Louisville, Kentucky, office, which handles all the packages for UPS. He told me that he worked at this office on September 22, 2000, when he made a seizure of a shipment going to PJ SWINK at **LOCATION 4**. The shipment was seized because of the illegal importation of lottery materials and the package was from Costa Rica. The following was included in the package: lottery information relating to the Irish Sweepstakes, credit card authorizations, US birth certificates and a check.

26. On January 23, 2006, I drove by 2451 Cumberland Parkway, Smyrna, Georgia. I saw that this location was a UPS Store. At this store I spoke with Kirsten Ahrens, who told me that Box 3133 was opened by WILLIAM CLOUD in 1999 but had been closed since late 2004. Ahrens gave me mail delivered to that box after it was closed, which was addressed to WILLIAM CLOUD DBA EURO AMERICAN. The mail consisted of two overdue bills from Bell South. Ahrens said that a woman picked up the mail for this box. Ahrens identified a Georgia Department of Motor Vehicles photograph of MARY MCRAE as the person picking up the mail. Ahrens emphasized she was 100% sure MCRAE picked up the mail.

27. On January 24, 2006, I spoke with Suzanne Roberts who told me that she is the Lead Teller at Georgia State Bank in Austell, Georgia, and has worked at this branch for eight years. Roberts remembered a MARY MCRAE coming into the branch to cash

48

checks and get cashiers' checks made to GARY YORK drawn off the EURO AMERICAN account.  MCRAE also often cashed EURO AMERICAN business checks for $7,300.  Roberts would give MCRAE the cash in a Georgia State Bank envelope in large denominations.  MCRAE would put the envelope in her purse and leave.

28.  On January 26, 2006, I spoke with Dave Bunch, who told me he works for the US Post Office in charge of bulk mailing in West Plains, Missouri.  He has worked at this Post Office since before 1986.  Bunch knows PJ SWINK by sight as a customer and member of the community. Based on his interaction with PJ SWINK and his knowledge of the West Plain Post Office he told me the following:

a.   For about two or three years, PJ SWINK has purchased more than 2000 first class stamps every two weeks. Bunch also sees PJ SWINK pick up sixty 2-foot letter bins every two weeks.  Each bin can hold 500 letters and is used in bulk mailings.  Although Bunch has seen PJ SWINK pick these up, he has not seen her drop them off at the West Plains, Missouri, Post Office.

b.   Letters being delivered to the West Plains Post Office would be postmarked Springfield, Missouri.  If a person wanted a letter to have a postmark from Little Rock, Arkansas, the person would have to drop off the letter only about 50 miles south of West Plains.  If a person wanted a letter to have a

49

postmark from St. Louis, Missouri, the person would have to drop off the letter about 80 miles north or east of West Plains, Missouri.

c.   Bunch knows that SWINK operates a bulk mailing business and confirmed that she is receiving mail at **LOCATION 4**.

29.   On January 26, 2006, I spoke with Deputy Don Reid of the Howell County Sheriff's Department.   Deputy Reid said that he has been a deputy in Howell County, Missouri, for at least 18 years.   **LOCATION 4** falls in the jurisdiction of Howell County. Deputy Reid told me that he personally knows PJ and **MICHAEL SWINK** as husband and wife.   Two or three years ago, Reid went inside **LOCATION 4** and saw people stuffing envelopes.   While inside **LOCATION 4**, he saw a computer system. PJ SWINK has told Reid that she operates a bulk mailing business at **LOCATION 4**.   Deputy Reid also knows that MICHAEL SWINK purchased a printing business in the name of Blacksmith Printing about two years ago.   MICHAEL SWINK also said that he had purchased property in Henderson, Arkansas, which is about 45 miles south of West Plains.   MICHAEL SWINK said he maintains a camper on the property.   Leslie Wilbanks delivers mail out of the area for PJ SWINK on a regular basis.

30.   On January 26, 2006, Deputy Reid drove me to **LOCATION 4**.   I saw that a large sign was posted next to the entrance to **LOCATION 4**. The sign read Blacksmith Printing.   On the bottom of

the sign are two smaller signs showing the MasterCard and Visa Logos.  I also saw vehicles parked in front of the building.

31.  On January 26, 2006, I reviewed the Howell County arrest records for WILLIAM CLOUD.  The record shows that CLOUD was arrested for possession of marijuana on November 1, 1996.  He was booked into the Howell County Jail and was released to the custody of MICHAEL SWINK.  The address listed on the booking information for WILLIAM CLOUD is 2181 Pair Rd, Marietta, Georgia.

32.  On January 26, 2006, I saw a business card in the name Blacksmith Printing pinned to a bulletin board in the foyer of Woods and Huston Bank in West Plains, Missouri.  Below the name Blacksmith Printing is the name WESTERN INTERNET.  The address listed for the business is LOCATION 4.  The names on the card include MICHAEL and PJ SWINK.

33.  On January 26, 2006, I spoke with Andrea Taylor, who told me that she is a Personal Banker for Woods and Huston Bank in West Plains, Missouri.  She has worked at this branch for eight years.  Part of that time, she was a teller and met PJ SWINK.  PJ SWINK told her that she operates a bulk mailings business.  PJ SWINK currently has an account in the name of Blacksmith Printing.  Taylor heard of the business name CARNEGIE SCHOLARS from PJ SWINK, but it was a few years ago.  SWINK told Taylor that she used the business name to hire college students to stuff envelopes.  Taylor knows that SWINK comes into the bank

51

to make deposits, which usually consist of checks. MICHAEL SWINK also occasionally makes deposits.

34. On March 27, 2006, I spoke with a Supervisor with United Parcel Service. I reviewed records for Shipper Number F71245, and saw that it belongs to EURO AMERICAN FAX CO. I saw that the billing address for this account is **LOCATION 3**.

35. On April 4, 2006, I spoke with Detective Guarda Laurence Donnely of Shannon Guarda Station, which is the police agency that handles the Shannon area in Ireland. Detective Donnely told me that he interviewed Michael Bolger, who said that Unit C12 Smithstown Industrial Estate (same address from which lottery letters were sent to victim Enge, as discussed in paragraph 13) was a mailing address he operated for a lottery based in the United States called the SHAMROCK AGENCY. The SHAMROCK AGENCY now uses a mailing address in Limerick, Ireland. Bolger also uses the address of 43 Cill Chais, Shannon, Co Clare, Ireland. Bolger told Donnely that he collects the mail at the mailing address and then forwards it in a sack to an address in Holland. Bolger said he received payment for his forwarding via Western Union. On November 9, 2004, he received a $3,000 payment. Bolger said as far as he knows the people who operate the business in the USA are WILLIAM CLOUD and SCOTT HENRY WALTHER.

Additional Probable Cause

52

36.   A mail cover was conducted from October 14, 2004 to June 6, 2005, at **LOCATION 1**.  During that time S WALTHER received mail at this address from Citibank for WORLD EXPERT, American Express, Capitol One and K Walther at 2530 Wilshire Blvd, Santa Monica, California.

37.   On February 10, 2006, I spoke with Postal Inspector Delaney who told me that she reviewed records from a mail cover placed on **LOCATION 4**.  She said that two letters were mailed to Albert Summers at **LOCATION 4** from "RL DOORNE- WORLD EXPERT FUND." The postmark on the letters was February 5, 2006, from Little Rock, Arkansas.  The return address on the envelope was 11 Schoenhaus Plaza, Berlin, Germany.

38.   In the course of the investigation I reviewed California fictitious business name statements and filings and found the following:

a.   On October 6, 1999 a business name statement for EUROPEAN UNION COMMISSION was filed in Los Angeles County with **LOCATION 2** as the business address.  The filer's name is H WALTHER.

b.   On November 7, 2000, a business name statement for EUC was filed in Santa Barbara County with a business address of 330 W Victoria St, Santa Barbara, California.  The contact name is S WALTHER.

c.   On November 30, 2001, a business name statement

53

for WORLD EXPERT was filed in Santa Barbara County with a business address of 100 Oceano Ave, #3, Santa Barbara, California.  The contact name is S WALTHER.

d.   On April 4, 2002, a business name statement for EU PAYMENT SERVICES was filed in Contra Costa County with a business address of 100 Oceano Ave, Santa Barbara, California.

e.   On September 5, 2002 a business name statement for WORLD EXPERT FUND was filed in Los Angeles County.

f.   On October 29, 2002, a business name statement for EU AMERICAN PAYMENT SERVICE was filed in Los Angeles County with a business address of **LOCATION 2**.  The owner is S WALTHER at 100 Oceano Ave, Santa Barbara, California.

g.   On December 18, 2002, a business name statement for WW WEBPAY was filed in Santa Barbara County, with a business address of 100 Oceano Ave, #3.  The filer was S WALTHER.

h.   On October 2, 1998, a business name statement for NORTH AMERICAN PAYMENT was filed in Los Angeles County with a business address of 2530 Wilshire Blvd, Floor 2, Santa Monica, California.  The owner is J DESROSIERS.

39.  I reviewed Missouri Corporate Records showing that WESTERN INTERNET was established as a corporation on March 21, 2001, by PJ and MICHAEL SWINK.  The records indicate that the former name of WESTERN INTERNET is CARNEGIE.  The address for WESTERN INTERNET is **LOCATION 4**.

40.   I reviewed Georgia Corporate Records that show EURO AMERICAN was established as a corporation on August 8, 2003.   The registered agent for EURO AMERICAN is Charles Black at **LOCATION 3**.

41.   During the course of the investigation I reviewed phone records and tolls for phone number 770-819-8595.   This phone number is a Bell South phone number and matches the number listed on checks made payable to Bell South from EURO AMERICAN.   The phone number belongs to Euro American located at **LOCATION 3**.   The owners of the account are MARY MCRAE and WILLIAM CLOUD.   I saw that between 2002 and 2005, regular calls to Ireland and the Netherlands were made.

**Surveillance at LOCATIONS 1 and 5**

42.   On May 25, 2006, Special Agent Michael Zeihen of IRS-CID and I conducted surveillance of S WALTHER beginning at **LOCATION 1**.   During the surveillance SA Zeihen and I were separated.   SA Zeihen told me what he saw at the times when I was not present.   At 8:40 am I saw that the garage door of **LOCATION 1** was closed.   I then drove to S Walther's employers, at 509 Brinkerhoff, Santa Barbara, California and did not see S WALTHER's vehicle.   In addition, the blinds to the office were closed.   While I was returning from S WALTHER's place of employment, SA Zeihen saw S WALTHER in the driveway at **LOCATION 1**.   He also saw the garage door to **LOCATION 1** open and a Grey GMC

55

Yukon, California License Plate (L/P) 4DHY675, parked inside. Shortly after seeing S WALTHER in the driveway, SA Zeihen saw him leave in the Yukon, L/P 4DHY675. SA Zeihen followed this vehicle onto Hwy 101, where I joined him. I then followed the vehicle back towards S WALTHER's place of employment. I did not see S WALTHER park his vehicle but saw him walking away from it and towards his office. He was carrying papers. After S WALTHER was out of sight I walked by the GMC Yukon, which was parked on a public street. On the front passenger seat, in plain view, were papers which read "Borrowers Estimated Closing Statement" from Stewart Title. I also saw two checks in the middle console of the vehicle. The checks were closed in the console so that only half of each check was showing. I could see, however, that one check was made out to S WALTHER. On the second check I saw a word describing the payor of the check as "WORLD" and could see part of Citibank's logo on the check. Based on my review of bank records, specifically those described in paragraph 21d, I recognized this as a check from S WALTHER's World Expert account, number XXXXXX4990, at Citibank.

43. I performed a check of California DMV records and saw that California license plate 4DHY675 is a GMC that belongs to SCOTT WALTHER at **LOCATION 1**.

**Surveillance at LOCATION 2**

44. I spoke with Postal Inspector Delaney who told me that

on April 10, 2006, she spoke with the receptionist at **LOCATION 2**.
Inspector Delaney told me the receptionist's name is Karen.
Karen told Inspector Delaney that Kristin Walther, H WALTHER's
daughter, is the building manager.  Karen also told Inspector
Delaney that HENRY WALTHER is frequently in the office.

45.   On June 5, 2006, Inspector Delaney and I conducted
surveillance at **LOCATION 2**.  During the surveillance, I saw a red
Jaguar, California L/P 4HTT658, drive into the underground
parking for **LOCATION 2**.  I then went to the public lobby of
**LOCATION 2** and waited for the elevator.  The elevator stopped at
the first floor and was coming up from the parking garage levels.
Inside the elevator I saw H WALTHER, who was carrying a dark
colored leather type briefcase and two plastic bags.  I got
inside the elevator with H WALTHER but got off on the second
floor.  H WALTHER stayed in the elevator which was going to the
third floor.  I then went to the third floor and got out.  When I
got out of the elevator I immediately saw H WALTHER talking to a
woman in the public area by the receptionist's desk.  I heard H
WALTHER tell her that he had an appointment later that day.  H
WALTHER then walked behind the receptionist and turned left
carrying his briefcase.  I asked the receptionist for a
fictitious business and said I had an appointment.  She then
began flipping through an appointment book that was on the desk.
Later in the day, I saw a Federal Express delivery truck arrive

and park near the entrance to the underground parking.

46.   On June 5, 2006, Inspector Delaney told me that she went into the parking garage where she saw a red Jaguar with California L/P 4HTT658 parked on the lowest level.  She also told she saw a Federal Express drop off box on the first level of the parking garage.

47.   I performed a check of California DMV records and saw that California license plate 4HTT658 is a Jaguar that belongs to H WALTHER.

**Additional Shipping Records**

48.   On June 9, 2006, I reviewed DHL shipping records for HENRY WALTHER LAW OFFICE.  The records show that there are two separate customer numbers for HENRY WALTHER LAW OFFICE but that the billing address for both accounts is **LOCATION 2**.  I saw the two invoices that were associated with HENRY WALTHER LAW OFFICE:

a.   Invoice #19860150, dated June 13, 2005, shows that six packages were sent to H WALTHER, at 2531 Wilshire Blvd, 3rd Floor, Santa Monica, California from World Wide Expert located in Amstelveen, Amsterdam.  The date on the packages was June 4, 2005.  Although the sender is World Wide Expert, the Henry Walther Law Office paid the invoice.  The bill is for $262.55.  I know that this is the same amount as the amount paid to DHL on check number 2243 dated June 21, 2005, from US Bank account XXXXXXXX5188, in the name of the SHAMROCK AGENCY.  In the memo

58

section of this check is the invoice number.

b.   Invoice 19995975 dated July 3, 2005, shows that a package was sent to Atlas Info in Costa Rica by Eana May.  The amount of the bill was $113.67.  I know that this is the same amount as the amount paid to DHL on check number 2262 dated June 29, 2005, from US Bank account XXXXXXXX5188, in the name of the SHAMROCK AGENCY.  In the memo section of this check is the invoice number.

49.  On June 23, 2006, I reviewed United Parcel Shipping records for Shipper Number F71245, which belongs to EURO AMERICAN FAX CO, and has been opened since 2001.  I saw that the billing address for this account is **LOCATION 3** and the contact person is William Cloud.  **LOCATION 3** has been the billing address for EURO AMERICAN FAX since January 2005.  I also reviewed invoices for this account.  I saw that since the account opening until as late as June 14, 2005, there were regular packages being shipped to "Henry Walthers Attorney at Law" in Santa Monica, California, by EURO AMERICAN FAX.  Regular packages were also sent to Gary York in Springfield, Missouri, who I know is a payee on numerous checks from the EURO AMERICAN FAX bank account at Georgia States Bank (account number XXX967 (see paragraph 21k)), and the HENRY WALTHER WIRE ACCOUNT at US Bank (account number XXXX0111 (see paragraph 23a)).  Glenda Emmet at Astro Computer Service in Canoga Park, California, also received many packages from EURO

59

AMERICAN FAX, billed at **LOCATION 3**.  I know that Astro Computer

Service has received over $200,000 from the EURO AMERICAN FAX

bank account at Georgia State Bank (account number XXX967 (see

paragraph 21k)), in addition to at least $6,000 from the WORLD

EXPERT account at Encino State Bank (account number XXXX0792 (see

paragraph 21a)).  The most recent UPS shipments included two

Worldwide Express shipments: one to William A. Cloud in

Amstelveen, Netherlands, on March 10, 2006, and another to

Michael B in Shannon, Ireland, on April 25, 2006.  I know that a

Michael Bolger in Shannon, Ireland, told Detective Guarda Donnely

that he collected mail for William Cloud and Scott Walther in

Ireland and then forwarded that mail to the Netherlands (see

paragraph 35).  There have been no shipments since April 2006.

## AMERICAN EXPRESS RECORDS

    50.  On June 12, 2006, I reviewed American Express records

for account XXXXXX1785, card numbers 32004 and 31006.  The name

on this account is HENRY W WALTHER and the billing address is

**LOCATION 2**.  A second card associated with this account belongs

to Janet Walther.  The last statement was issued on December 17,

2003.  Charges on these cards include: groceries, wireless and

internet service, hotels, clothes, airline tickets, cruises, hair

care, sports club dues and equipment, restaurants, home

improvement, concerts, gas and other apparent personal

expenditures.  Checks from the Lottery Accounts were used to pay

off these cards.  The accounts included: The Shamrock Agency (US Bank-XXXXXXXX5188), World Expert Fund (Bank of America-XXXXXX3139), World Expert (Encino Bank-XXXXX0792), Shamrock Agency (Wells Fargo-XXXXXX1695), and World Expert (Wells Fargo-XXXXXX4509) in addition to the Bleed account Henry Walther Attorney Law Office (US Bank-XXXXXXX3928).

51.  On June 12, 2006, I reviewed American Express Records for account XXXX-XX9515, card numbers 56009 and 57007.  The name on this account was HENRY W WALTHER/Century Com Consult, but changed to OGDB Data in January of 2002.  The billing address is **LOCATION 2**.  The last statement was issued on September 17, 2002.  Checks used to pay off this account were from Lottery Accounts including The Shamrock Agency (US Bank, account number XXXXXXXX5188) and World Expert Fund (Encino Bank, account number XXXXX0792).

Additional Probable Cause Relating to Tax Evasion

52.  I reviewed S WALTHER's tax returns for the years 2001-2004.  They show his only source of employment income is from Phillip J Longo.  He states that he has a bookkeeping business operated in the 2001 and 2002 years.  In neither of these years does S WALTHER claim to have more than $4,775 in sales before expenses.  In the years 2001-2004, his gross income ranges from the lowest of $33,501 to the highest of $34,236.

a.  S WALTHER's 2004 tax return shows his home address

61

as **LOCATION 1**. The return indicates claims income of $34,236, with $34,200 being wages from Phillip Longo Law Offices. On the same return, S WALTHER claimed deductions of $19,047 of mortgage interest for his residence, and another $8,036 of real estate taxes. This alone represents over $27,000 of his income. Based on this same 2004 return, S WALTHER claims that $5,419 in state and federal taxes were paid for all of 2004.

b.     Based on my experience and the values listed on the S WALTHER's return, I have determined that S WALTHER claimed to have only $1,734 for all of his living expenses. Furthermore, based on my experience and review of the returns, I have determined that there is no accounting for the millions of dollars in deposits to bank accounts on which he is a signor.

53. I reviewed loan records from Washington Mutual for S WALTHER. On November 10, 2003, S WALTHER applied for a loan to purchase the house at **LOCATION 1**. On the loan application S WALTHER reports he is making $7,000 per month from his job with Longo, and an additional $3,000 per month as a self employed consultant/bookkeeper. S WALTHER claims to have had both jobs since 1999. The application appears to be signed by S WALTHER.

54. On March 27, 2006, I reviewed the web site www.longolawoffices.com and saw that it is located at 509 Brinkerhoff Ave, Santa Barbara, California. The website states that S WALTHER is a licensed Enrolled Agent and represents

clients before the IRS.  It also purports that he prepares over 300 personal income, corporate, trust, estate, and gift tax returns annually.  The website also reports that S WALTHER graduated with a Business degree from University of California at Santa Barbara with an emphasis in Accounting.

55.  I know based on my experience that individuals who commit tax evasion often keep records of their income at their home.  These records include bank records, records of expenses and deductions and of other sources of income.  Furthermore I know that individuals involved in financial crimes often store evidence of those crimes at their homes.  These individuals often use their home as a base of operations to receive mail from their illegitimate businesses.

COMPUTER USE

56.  I know based on my training and experience that computers are a necessary part of business.  Computers are essential and regularly used for preparing documents and maintaining business records like banking activity, sales and expense reports, client lists and others.  They are also used to maintain databases of names such as mailing lists that generate form letters for mass mailings.  In addition, I know that computers are often used to create documents with complex graphics like the solicitations I reviewed provided by victims. These are usually created using word processing and graphic arts

63

programs.  Furthermore I know that computers are used at homes by individuals in order to store financial records and to communicate with other people via email.  Computers are also regularly used for conducting financial transactions online banking and online shopping at home and in businesses.  More specifically, I know that S WALTHER and H WALTHER use computers, as further described as follows:

a.  On June 27, 2006, I reviewed a web page for the Palisades High School Alumni Association.  I know that Palisades High School is located in Pacific Palisades, California, the city in which H WALTHER lives.  A link to "Alumni email addresses" lists the alumni for the class 2004.  S WALTHER lists his email address as "furls at earthlink.net."  The website shows S WALTHER's city as Santa Barbara, CA.

b.  I reviewed bank records for Bank of America account number XXXXX-X6996, and XXXXX-X0214 in the name of S WALTHER.  The mailing address for this account is **LOCATION 1**.  I saw that from 2005 through February 2006, which is the latest statements I reviewed, online banking transfers were completed. The latest online transfer completed was on January 3, 2006.  I know based on experience that online banking transfers are completed over the internet via a personal computer.

c.  I reviewed American Express records for account number XXXX-XX1785-X2004 in the name of H WALTHER, which shows a

billing address of **LOCATION 2**. The last statement date for the account is January 17, 2003. Several charges are indicative of computer usage. Listed below these charges is "INTERNET SVC."

SUMMARY OF PROBABLY CAUSE FOR LOCATIONS 1, 2 AND 5

57. For the court's convenience, the following is a brief summary of the probable cause related to each of the locations to be searched in the Central District of California:

a. **LOCATION 1**. Currently, one Lottery Account lists **LOCATION 1** as the business/mailing address. S WALTHER has used his residential address for other bank accounts that were involved in the scheme but are now closed. Surveillance observed S WALTHER from **LOCATION 1** to his place of employment in his vehicle (**LOCATION 5**). The vehicle had been parked in the garage. Inside the vehicle in plain view were closing statements related to a home purchase as well as a check that appeared to be from the bank account mentioned above. Further, S WALTHER files tax returns using **LOCATION 1** as his residential address. S WALTHER claims he runs a small business in addition to being employed elsewhere. A mail cover shows mail delivered from banks and credit companies (indicative of financial records relevant to the fraud and to the tax evasion) to **LOCATION 1**. It also showed mail from **LOCATION 2** being delivered to **LOCATION 1**. Fictitious business name statements for multiple lottery companies come back to S WALTHER's previous residences. As stated above, my training

65

and experience further leads me to believe that evidence will be found at S WALTHER's residence.

   b.   **LOCATION 2.**   There are multiple bank accounts involved in the scheme -- Lottery Accounts, Payment Accounts, and a Bleed Account -- that list **LOCATION 2** as the business address. The statements are mailed to **LOCATION 2.**  These accounts are Lottery Accounts, Payments Accounts and a Bleed Account.  One bank account in the scheme came back to the second floor at the street address for **LOCATION 2.**   Some of the accounts are still open.  H WALTHER lists **LOCATION 2** as the billing address for an American Express card.   A second card for H WALTHER in the name of Century Com Consult, later switched to OGDB, also lists **LOCATION 2** as the billing address.  The payments for this card were made with funds from the scheme.  Federal Express records show **LOCATION 2** as the billing address for H WALTHER.  Billing records show packages being billed on that account regularly delivered to **LOCATION 4.**  Surveillance showed a Federal Express pick up box in the garage of the building at **LOCATION 2.** UPS records show deliveries being made by H WALTHER Attorney in Santa Monica from **LOCATION 3.**  DHL shipping records show **LOCATION 2** as the address for the Henry Walther Law Office.  The DHL invoices show a shipment being billed to this account coming to 2531 Wilshire Blvd, 3rd Floor, Santa Monica, CA from World Wide Expert in Amsterdam.  Another DHL invoice shows the account was used to

ship a package to Atlas Info in Costa Rica.  H WALTHER was seen carrying a briefcase into **LOCATION 2**.  The receptionist for **LOCATION 2** told Postal Inspector Delaney that H WALTHER is frequently in the office.  Two county business name statements for the Lottery Companies use **LOCATION 2** as the business address. Another business name statement uses the second floor of the building at **LOCATION 2** as the mailing address.

   c.   **LOCATION 5**.  **LOCATION 5** is registered to S WALTHER at **LOCATION 1**.  Financial documents including a check that appeared to be from one of the lottery accounts was seen in **LOCATION 5**.  Surveillance has followed **LOCATION 5** form the garage of **LOCATION 1** to S WALTHER's place of employment.

METHODS TO MINIMIZE DISCLOSURE OF PRIVILEGED MATERIAL

   58.  It is possible that items protected by the attorney-client privilege or the attorney work-product doctrine may be present at **LOCATION 2** and **LOCATION 3**.  In addition, H WALTHER is an attorney licensed to practice in the State of California, and CHARLES BLACK is an attorney licensed to practice in the state of Georgia.  Therefore, the following steps will be taken to avoid the disclosure of privileged information:

   a.  The searching agents will be instructed by memorandum, a copy of which is attached hereto as Exhibit "1," not to review any documents that appear to constitute communications between H WALTHER and his attorneys or between H

67

WALTHER and his clients or between CHARLES BLACK and his attorneys or between CHARLES BLACK and his clients.

b. The searching agents will conduct a limited review of a document to determine whether the document may be privileged and whether the document falls within the scope of the warrant. Once a potentially privileged document has been determined to fall within the scope of the warrant, the searching agent will cease reviewing the document and immediately provide it to a pre-assigned "taint" searching agent.

c. The "taint" searching agent will seal and mark the document(s) and attachment(s), if any, as "potentially privileged," and submit the sealed document(s) to a "taint" AUSA. The "taint" searching agent(s) and AUSA will play no role in the further investigation or prosecution of the case.

d. Although the US Postal Inspection Service and IRS-CI case agents may be present at **LOCATION 2** and **LOCATION 3**, or available by telephone to answer questions from the searching agents, they will not search any files in which there is any likelihood that privileged items may be found. The "taint" AUSA will be available by telephone during the execution of the warrant.

e. The "taint" AUSA will collect and review all items potentially subject to a claim of privilege. If the "taint" AUSA determines that material is either privileged or outside the

scope of the warrant, the material will be resealed and returned to the search location. This determination may include a determination as to whether the crime-fraud exception or other exception to or waiver of the privileges applies to a particular item. If the crime-fraud exception to the attorney-client privilege may apply to any item, the "taint" AUSA will prepare an in camera, ex parte motion to the Court to determine whether the exception applies.

SEALING REQUEST

59. The criminal investigation into the activities of the subjects of this affidavit is continuing and further interviews, subpoenas for information and other investigative techniques are contemplated. Disclosure of the contents of this affidavit would seriously impede the investigation by disclosing details of the government's investigation and evidence gathered in connection herewith. The subjects of the investigation would be able to learn the present extent of the government's knowledge. I believe that disclosure of this affidavit would jeopardize future contacts with associates of the subjects, as well as enable the subjects of the investigation to identify those individuals who are cooperating with the government, to the detriment of the investigation. I also believe that such disclosures would lead to pressure on these and other potential witnesses not to speak to government agents and could seriously impede the

investigation.  Accordingly, I request that the Court issue an order sealing this affidavit and accompanying schedule, and the sealing order, until the government notifies the court that it is appropriate to unseal these documents.

<u>CONCLUSION</u>

60.  Based on the foregoing, I believe that there exists probable cause that evidence of mail fraud in violation of Title 18, United States Code, Section 1341; mailing of lottery materials in violation of Title 18, United States Code 1302; money laundering in violation of Title 18, United States Code, Section 1956; conspiracy, in violation of Title 18, United States Code, Section 371; subscribing to a false return, in violation of Title 26, United States Code, Section 7206(1); and tax evasion, in violation of Title 26, United States Code, Section 7201, will be found at the premises to be searched.

_____

Timothy Nugent
Special Agent, IRS Criminal Investigation Division


Subscribed and Sworn to me
On this _50_ day of June 2006

            SUZANNE H. SEGAL

_____

UNITED STATES MAGISTRATE JUDGE

70

# *Memorandum*

| Subj: | Date: |
|---|---|
| Search Procedures for Execution of Warrants at 2530 Wilshire Boulevard, Floor 3, Santa Monica, California, and 231 Maxham Road, Suite 100, Austell, Georgia | June 30, 2006 |

| To: | From: |
|---|---|
| All Agents Executing Above-Described Search Warrant | AUSA Ellyn Marcus Lindsay *ML*<br>Major Frauds Section |

This memorandum is designed to serve as a guide for the agents and others participating in the above-referenced searches. Because of the likelihood that during this search of law offices, material protected by a claim of privilege may be encountered, the following guidelines must be followed.

This memorandum, as well as the affidavit and warrant, will describe procedures for dealing with arguably or potentially privileged material because two of the targets of the searches, Henry Walther and Charles Black, are attorneys who will likely have material protected by a legitimate claim of privilege involving matters that are not part of this investigation, do not fall within the scope of this warrant, and should not be taken, as well as material that may or may not be protected by a legitimate claim of privilege involving matters that are part of this investigation and fall within the scope of this warrant. These instructions set forth procedures designed to minimize the intrusion into privileged material and to ensure that the privilege is not violated.

This memorandum contains information relating to some of the legal requirements for participating in the search of the above locations. It is important that you take the necessary time to familiarize yourself with the contents of this memorandum, the affidavit in support of the search warrant, and the warrant

1

EXHIBIT

*1*

itself.  Please keep your copy of this memorandum, the affidavit, and the warrant and refer to them as necessary during your search.

## B.    PRIVILEGES RELATING TO A SEARCH OF LAW OFFICES

The attorney-client privilege protects (1) confidential communications between (2) a client (someone who is seeking legal services or advice) or his representative (3) and an attorney (for example, Henry Walther) or to the attorney's agent (for example, the attorney's secretary, paralegal, private investigator, or another attorney) (4) which is made for the purpose of facilitating the rendition of legal services or advice.  There are situations where the privilege may be waived and no longer protects the communications.

There is also a privilege referred to as the attorney work-product doctrine.  Attorney work product consists of material which reflects an attorney's efforts at investigating and preparing a case or in anticipation of litigation, including the attorney's (or the attorney's agent working at the attorney's direction) pattern of investigation, assembling of information, determination of the relevant facts, preparation of legal theories, planning of strategy, and recording of mental impressions.

One exception to the attorney-client or work-product privileges where the privilege is waived is called the "crime-fraud" exception.  When the client uses the attorney-client relationship to engage in ongoing fraud rather than to defend against past misconduct, a privilege does not apply.  Thus, if a client communicated to an attorney seeking the attorney's's help to facilitate a narcotics deal, that communication would not be privileged.  If however, the client sought advice about defending against a past narcotics deal, or even the client's sentencing exposure for a current narcotics deal, that would be privileged because the attorney would not be helping the client commit the crime; the attorney would merely be giving advice concerning the client's legal problems.

Whether the attorney-client or work-product privilege applies is determined on a case-by-case basis; if you have doubts, please resolve them by contacting the prosecutor designated by the United States Attorney's Office as the "taint" Assistant United States Attorney ("AUSA") for this search.  The taint AUSA will be walled off from subsequent participation in the investigation or prosecution of the underlying matter.  The taint AUSA shall not disclose the contents of privileged material to the AUSAs and agents who are investigating the matter, absent court order.

2

A number of   ? items described in Attac   ent "B" (Items to be Seized section) of the warrant will not be privileged including, for example, bank and telephone records, documents relating to travel, and court records. However, we expect that many of the documents will be subject to a potential claim of privilege. Note that the payment of attorney's fees generally is not privileged information, while the reason for the payment generally is.

If a searching agent finds a document that (1) falls within the scope of the items to be seized under the search warrant and (2) contains at least some potentially privileged information, you should seize and segregate the document; later, the taint AUSA will review the document, determine whether it is privileged, whether there has been a waiver of the privilege or a valid exception exists (that is, the crime-fraud exception) and redact the privileged information and provide the investigators and prosecutors with a copy of the document that discloses only the unprivileged information.

C.   REQUIRED READING

Before you begin to search, you must read, be familiar with, and understand the contents of:

1.   This memorandum;

2.   The Affidavit of Special Agent Timothy Nugent (California), and of Special Agent Pamela Lindquist (Georgia) in Support of the Application For Search Warrants; and

3.   The Search Warrant and its attachments.

All of these documents will be provided to you before the search begins. Prior to searching, you must sign the attached form indicating that you have read each of the above-listed documents, are familiar with their contents, and will conduct the search in accordance with the requirements and procedures set forth in those materials.

D.   INSTRUCTIONS

1.   The search team will be comprised of a search "team leader" and other personnel of the United States Postal Inspection Service ("USPIS") and the Internal Revenue Service Criminal Investigation Division ("IRS"), including those especially trained in the forensic examination of computers, working under the direction of the team leader. The searching agents have been selected in part because they will have no further role in the investigation of this matter; under no

3

circumstances should the case agents view any documents that may contain privileged information seized during the execution of the warrant.

2.    Every effort should be made to minimize disruption caused by the presence of agents executing this warrant of any business being conducted at the locations.  If within the premises, there are separate individual offices, storage areas, boxes, cabinets, or files that are clearly distinguishable and identifiable as belonging to matters not described in Attachment B to the warrant, the searching agents should not search those locations, should <u>not</u> attempt to determine if items in those locations are responsive to the warrant, and should leave items in those areas in their original locations.

3.    All adults present at the search location must be given a copy of the warrant and attachments, but <u>not</u> this memorandum or the affidavit, as the affidavit is filed under seal.

4.    The searching agent (without the involvement of the case agent(s)) will be responsible for making an initial determination of whether a particular item (1) falls within the scope of the warrant or (2) is privileged.  Prior to reading any document in its entirety, the searching agent should attempt to determine whether the document may be privileged, that is, whether the document appears to contain or refer to communications from or to an attorney or law firm.  Look to see whether the document appears to be on attorney or law firm stationery or letterhead, is otherwise denoted as a communication from a legal advisor to a client, or is stamped privileged.  Also, look for names or entities that obviously identify themselves as attorneys or legal counsel on the documents (John Doe, Esq. or the Law Firm of John Doe and Associates).

In the event that you determine a document is potentially privileged, only a limited further review of that document should be conducted.  This type of limited further review will vary based on the type of document, but it essentially means that a potentially privileged document should be looked at by the searching agent only to the extent necessary to determine whether it falls within the scope of the warrant, that is, the review should be the minimum review necessary to determine whether the document is responsive to the warrant.

For instance, if a document has a "Re" or "subject" line that indicates that the communication concerns advice from or to an attorney or law firm or is work product from or to a third party (another attorney, accountant, investigator, etc.) acting at the direction of the attorney in anticipation of litigation, it will often be sufficient to determine at that point whether the document falls within the scope of the warrant.  However, if

4

a document does not have such a line, or if that line does not contain sufficient information, it will be necessary to scan the document looking for key words to determine whether the document falls within the scope of the warrant.  On the other hand, once it is determined that a document is outside the scope of the warrant, it should be set aside to be returned.

Once a potentially privileged document has been determined to fall within the scope of the warrant, then stop reviewing the document at that point.  Seal and mark the document(s) and attachment, if any, as "potentially privileged," keeping track of the particular location from which the document(s) is seized. The "taint" AUSA will also be available during the search to answer questions that may arise about the applicability of a privilege.

5.    The searching agents should deliver the sealed items to the taint AUSA.  If the taint AUSA determines that material is either privileged or outside the scope of the warrant, the material will be resealed and returned to the search location. This determination may include a determination as to whether the crime-fraud or other exception to or waiver of the privileges applies to an item.

6.    The searching agents who have conducted a review of potentially privileged material, and the taint AUSA, shall be ineligible for any subsequent participation in this investigation, and shall not disclose the contents of any privileged, or potentially privileged, material to anyone else not on the search team other than the taint AUSA, unless ordered by the court.

7.    The term "documents" includes information maintained in computerized form.  Accordingly, the search of computer equipment and peripherals will be subject to the same requirements with respect to the handling of potentially privileged material as applies to the search for material held in "hard copy" form.

8.    The taint AUSA shall not disclose the contents of any privileged material to any agents or AUSAs who are involved in the investigation, such as the case agents, absent a court order.

**E.**   **CONCLUSION**

In order to avoid impinging on valid attorney-client relationships, these guidelines take the least intrusive approach consistent with the requirements of this investigation and effective law enforcement.  These procedures are designed to ensure that privileged materials are not improperly viewed, seized, or retained during the course of the search and employ precautions to ensure that the materials are reviewed for privilege claims and that any privileged documents are returned to the premises of the law offices where they are seized. This investigation depends on your adherence to the legal requirements governing the execution of this search warrant, searching the search location, handling seized items, and any subsequent involvement in your role as a searching agent.

STATEMENT OF PARTICIPATING AGENTS

I declare that I have read the following documents and am familiar with their contents:

1.   Memorandum for Search of Premises of Law Offices;

2.   Affidavit of Special Agent Timothy Nugent (filed under seal);

3.   The search warrant and attachment.

I further declare that I will conduct the search in accordance with the instructions set forth in the above.

DATED:   July ___, 2006.

SEARCH PREPARATION MEETING

DATE: _____

PLACE: _____

CONDUCTED
BY: _____

_____

ATTENDED BY:

NAME                                    AGENCY

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

_____       _____

## TELEPHONE NUMBERS

**Designated Privilege AUSA — May Contact Regarding Any Subject Including Privilege**

      AUSA Dorothy Kim

      Office:  (213) 894-3779

      Cell:   (323) 547-3173